Good morning, everyone. We have lived up to the adage that the last shall be first, because one of the counsel in the first case is tied up at the train station, so we thank counsel for agreeing to switch, and we'll proceed with Shemokin, I think it is, Shemokin Filler. Ready to proceed? Don't have to, I mean, we all have got a lot to do today, so. I'm happy to call it a day if you are. And I am a little hard of hearing, Your Honor. Oh, okay, all right, okay. I'll try not to start, but I'll try to speak up. Yes. Good morning, members of the panel, and may it please the Court, I am Adele Abrams for the appellant, Shemokin Filler Company. I request two minutes for rebuttal. All right. The issues in this case are whether Shemokin Filler's carbon products manufacturing facility is a coal mine within the meaning of the 1977 and 1969 Mine Acts, and whether the administrative law judge properly excluded evidence and testimony concerning the Secretary's actions in 2000 and 2004 to transfer other similarly situated carbon plants from the jurisdiction of the Mine Safety and Health Administration or MSHA. What's your best argument that you're not under the mining jurisdiction and that you're under OSHA? Can you hear me okay? Pardon? Well, my question was can you hear me okay, but you clearly can't. I apologize. I speak softly, I mumble, and I speak quickly, so I'll try to do better. What is your best argument for the proposition that your client comes under the OSHA provisions and not under the mine health provisions? Okay. The carbon manufacturing facility deals solely with previously prepared coal, no raw coal. What's that in this statute? You dry it? You size it? What do you do that the operator of a mine does not do? Or vice versa, what does the operator of a mine do that you don't do? If you look at the definition of coal preparation in the Dictionary of Mining, Mineral, and Related Terms, which is put out by the U.S. Bureau of Mines and is relied on heavily by the Secretary, coal preparation is defined as things like de-dusting, grading, treating with dry and water methods, using dense media separation, jigs, tables, and flotation. Shamokin Filler does not even have the equipment. I'm looking at a different definition. I have these terms, breaking, crushing, sizing, cleaning, washing, drying, mixing, storing. Yes, that is the definition in Section 3I of the Mine Act. And again, all of those activities are typically done at coal mines and breakers to raw coal. May I ask you which of those things do you not do? We do not crush. We do not wash. I thought you did wash. We don't do the cleaning. I thought you did wash. You don't wash? We manufacture. We blend it, coal. But you dry it, don't you? There is a dryer that is used both for the non-mined materials as well as for the previously processed. Why do you dry it if it's not wet? To further take moisture out of it for the custom carbon products that we prepare based on chemical specifications. If you apply a functional analysis, I mean, if you do some of these things in the preparation of coal, why aren't you subject to the Mine Act? Because the coal has already been put into the stream of commerce. It has already been fully prepared by the coal mines and breakers into a marketable commodity. So I can understand. Your definition is only people who take that coal out of the ground, out of the mine, or strip it off the ground, those are the only ones that are subject to the Mine Act. No, Your Honor. Those are subject to MSHA, of course, but also breakers who take the raw mineral that someone else has extracted and they further process it using location tables. Isn't that what Schmoking does? Pardon? Isn't that what Schmoking does? No. You take it and you prepare it, you custom prepare it for other people. No, it has already been fully processed by the companies that we buy this from. What do you do? What is it, undisputed, that you do with the coal once you get it? Well, we use the coal in a few different ways. Okay, not how do you use it, but what do you do? I won't use the word process because that's a loaded term. Once the coal comes into you, before you sell it to the person who expects you're getting the coal ready to satisfy, what do you do to it? Well, we do not use it ourselves except as an ingredient with non-mine materials such as metcope, metcode anodes. But what do you do to it? And we blend it. We bag it or we blend it with these other materials. You don't size it? It's not being sized under the meaning in the Mine Act to remove dirt.  Do you size it? There's a minimal amount, but the Secretary's witnesses all stipulated that we do not do mineral milling, which is typically what – Yeah, that's a different – we're going from mining to milling. Forget milling for it now. Just focusing on the coal. Do you size the coal that you get before you sell it to the person who expects you're trying to get the coal ready to satisfy? Sometimes, but not always. It depends on the customer specifications. Is sizing you have to cut somehow, crush, don't you? We don't crush. How do you size it? There's some screens. And, again, there was testimony at trial that the type of screening that is done is not considered sizing. You bring up some interesting arguments, which are, I guess, somewhat persuasive. But we've got a fairly well-established body of case law at this point, in particular the R&S Services case. How do we get around that? Very easily. All of the cases – and this is consistent 40-plus years of precedent in the Third Circuit – all of the cases where MSHA jurisdiction has been found to lie has dealt with raw coal that has not yet been processed. It has not yet entered the stream of commerce. The coal that we purchase from these breakers and coal mines is the same coal that railroads, steel mills, schools, hospitals, and other factories purchase. Where in the statute are you getting that distinction from? You're saying that if you do something to it, that is the same thing that a mining company would do to it. It's different. A mining company would be under the statute. You're not because you're not doing it to raw coal. But as Judge Shigeru said, if we take the functional – or maybe it was – did you say the functional approach that we have to use? If we take the functional approach, what you're doing to it is the same, it's just at a different stage in the stream of commerce. That distinction that you're making, where in the statute does that distinction exist, and how do you deal with the language – and I think it's the Senate report that talks about any doubt in terms of the mine jurisdiction would be resolved in favor of finding jurisdiction under the Mine Act. Well, you know, the Secretary in all of the previous cases before this one had applied a functional test that if it was raw coal, it was under UNSHA, and if it was processed coal or prepared coal, it was under OSHA. Now, your Pennsylvania electric case where the court said they would apply a functional test, they really looked at the status of the coal test, and this is similar to the Stroh case as well, Third Circuit, that workers have to work with coal being processed and not a finished product that has already entered commerce. It's undisputed here that the coal that we purchase has entered the stream of commerce. So the status prong is equivalent to the functional test that the Secretary has advanced, but under Third Circuit precedent, it does favor excluding Shamokin from MSHA jurisdiction. Speaking of precedent, Judge Shigaris asked you about a body of law. With regard to the Dowd case, you're familiar with it, the OWD? I am having people hearing it around. Dowd versus Director of Office of Workers' Compensation, 846 Fed Second. In that case, it's a 1988 case, we said that Section 802, in interpreting Section 802, that section includes not only work done by operators of facilities in extracting the coal and taking it out of the ground, but also work done by operators of facilities used in the work of preparing the coal so extracted. That seems, in other words, further downstream, it seems like it fits Shamokin's operation because Shamokin gets its coal from the extractors, doesn't it, and then prepares it, custom prepares it? We do not get – no raw coal ever crosses Shamokin's threshold. The coal that we purchase has all been fully processed. It is marketable as purchased by us, and some of the coal goes right out the door in the same shape that we purchased it. Is it processed by extractors of coal? Sometimes, and there's also what are called breakers, which may be different companies. We are not a breaker, and again, the trial testimony acknowledged that we are not a breaker. You do bag coal, inter-site coal. Some coal, yes. You bag it, and you put it, and you load it, and you send it, but not to the ultimate consumer, is that correct? No, to the ultimate consumer. The ultimate consumer being? The various steel mills and other companies that we create carbon products for. And again, 75 percent of the products we manufacture have non-mine material mixed in. There's only a small percentage that is pure coal that is just re-bagged and shipped to them when they have use for it based upon those specifications. But we are not a breaker. We are not a custom coal preparation facility. And in the Penn Electric case, the circuit held that consumer processing coal incidental to their own consumption does not make it a custom coal prep plant. We are a consumer of prepared anthracite. Sometimes when we bag it and resell it, we are a distributor of it, but neither a distributor nor a consumer of it would constitute a custom coal preparation plant or a breaker. I'm not sure how you're reading PennElec or RNS or Air Products as the third to support your position. Can you help me with how you're getting your position out of PennElec and RNS and Air Products, which is the third one that you haven't mentioned? Yes. In fact, in the Air Products decision, which was a commission decision and review was denied by the circuit, MSHA testified in that they had believed Air Products to be under OSHA until they found out that they were actually receiving and dealing with and processing raw coal, at which point they asserted jurisdiction. And we would agree that that is correct. In the RNS case, again, the transportation by RNS was of raw coal. They were taking it to Air Products, actually. Why does it have to be raw coal as opposed to? Because that is the distinction in your whole line of cases going back again and all of the black lung cases. Well, that's a different situation. Where have you ever in the mining cases, not the black lung cases, where have we ever distinguished in terms of the meaning and the definitional structure of the Mining Act between raw coal processing and somebody downstream of commerce who does something to the coal, but it's not raw coal when they get it? What case have we ever made that distinction in? I heard all of it except the very last one. In what case have we? That was the most important part. In what case did we make that distinction? Well, you know, again, the Air Products case, they said that if it's processed coal or prepared coal, it's under OSHA. If it's raw coal, then it's under MSHA. The fact is that the cases do not. That was the Utilities case, though, too, wasn't it? Where the utility got the coal? The Associated Electric case and also Penn Electric. These distinctions are all drawn there. Haven't we always resisted per se bright line rules in this area? And that's what you seem to be arguing for. If it's raw, it's one category. If it's not, it's another. Haven't we always resisted that? Well, the cases all come down in the same way from the Third Circuit and the same thing in the Fourth Circuit, the Seventh Circuit, and the Eighth Circuit, all making that distinction. And, again, I can't. In the Black Lung case or in a mine jurisdiction case? It's there in the mine. In the Black Lung cases, it's there in the interstices of the language. But do you find that in the cases dealing with the jurisdiction of the Mine Act as opposed to the Black Lung case? And if so, where? Well, again, I have to go back to these Black Lung cases, which you cannot exclude consideration of because they all arise under the same statute and the same definitions are applicable. You create kind of an anomaly where you would… The purpose is very, very different. The purpose of the Black Lung Act, protecting the workers who work with coal and coal dust, is very different in the cases that make that distinction as opposed to whether or not some entity comes under the jurisdiction of the Mine Health and Safety Act. Right. But Title IV of the Mine Act is the Black Lung law, and the definitions used to confer jurisdiction for purposes of black lung benefits are the same definitions. Well, there are two definitions in the statute. Isn't that true? Well, Section 3I deals with the work of preparing the coal, which is the basis for the commission initially ruling. And it talks about, after listings, it then says, basically, I'm not looking right at the language, but any other action which is typically done by a coal miner or the operator of a coal mine, I think is what it says, or I am looking at now, whether or not the activities are those usually performed by a coal mine operator. So it's not the state of the coal, but what is being done to the coal. If the person doing that to the coal is doing something which is usually done by a coal mine operator, it seems to me it's very clear that the Mine Act applies and not OSHA. Well, if you single out the couple of things that Shemokin does do, such as storing or loading, then MSHA would have jurisdiction over schools, hospitals, railroads, steel mills, et cetera. And as Justice Alito said in his dissent in the RNS case, this would lead to absurd results of having people's basements inspected by MSHA twice a year. But it was in the dissent, and you understand we're kind of bound by what the two folks in the majority said. But he addressed that last antecedent rule, you know, which is if you took MSHA's approach to this of saying you don't have to do all of these things to be a coal mine, it would lead to absurd results. You could cherry pick one item out of there, loading or storing, and confer MSHA jurisdiction on that basis. All of the functions under Section 3I need to be considered in their totality, and Shemokin clearly does not do those. It buys previously processed and prepared coal. It doesn't have the equipment to treat raw coal at all, at all. And for that matter ‑‑ I understand your argument. You saved some time, I think, for rebuttal. Okay, yes, I did. We'll hear from you in rebuttal. Okay, thank you. Thank you. Ms. Johnson? I think this is the first time in 20 years I've ever seen council table with all of the attorneys being women. I would like to say that's a favorable trend, but after 20 years, I don't know if that's much of a trend. It's probably just a fortuitous circumstance. May it please the Court, my name is Sarah Johnson, and I represent the Secretary of Labor. This morning, I'd like to make three points to assist the Court in resolving this case. The first is that the Court can decide the legal issue presented on the plain meaning of Section 802I. The second is that the Court can decide the issue presented on the basis of its existing and controlling Mine Act precedent. And the third, in the event that the Court finds Section 802I to be ambiguous, is that the Court should give controlling deference to the Secretary's interpretation. What's your reading of RNS, Penelac, and Air Products? What is your reading of the three cases that we mentioned, three of the cases we mentioned with Ms. Abrams, RNS, Penelac, and Air Products? The Secretary believes that those cases lead to the inevitable conclusion that this facility is covered by the Mine Act. The Secretary isn't really breaking any new ground in this case or going into a new area of Mine Act jurisdiction. So starting as early as 1979 with Stout's Ferry, this Court held that the work of preparing coal or other minerals is included in the Mine Act, even if the operator is not also extracting the coal. So you can separate the functions of extraction and preparation. And in that case, in fact, Stout's Ferry didn't even start with what we've been calling raw coal, but that term is not used anywhere in the Mine Act. The company bought dredged refuse from the state of Pennsylvania and then prepared it by separating usable anthracite refuse from a sand and gravel mix. And the Court held that that was covered under the work of preparing the coal. Can I ask you to, if you can respond to a point that Ms. Abrams made, that why isn't it the case that if what you work with is already processed coal as opposed to raw coal, you are not subject to the Mine Act? Well, the statute doesn't speak in those terms. So if we go back to Section 802I, you know, the statute has a very specific definition of the work of preparing the coal. And it says that MSHA has jurisdiction over coal preparation. And the statute in Section 802I doesn't have either an express or an implied limitation on the Secretary's authority with regard to raw coal. So even though coal is already processed, it can go to another facility, and that facility could also be subject to the Mine Act? Yes, and we have examples of that very situation in the case law from this Court. So going back to R&S Services, you know, in that case, there were really three phases of coal preparation. So the first part of the preparation, you know, happened back in the early 1900s. The extractor pulled the coal out of the ground and initially prepared it. Then, and the sort of the refuse from that preparation process from the plant that was adjacent to the extractor became a refuse pile. And that's where R&S Services came in. It loaded the coal refuse, and then it transported it to the Cambria Power Generation Plant. I was curious, when does the, when does being subject to the Mine Act end? I mean, you know, you could take the coal and put it in a depot facility, and somebody else can pick it up and move it to another depot facility. Are all those transporters subject to the Mine Act? Well, that's the, you're asking about the sort of the edges of the definition of coal preparation? That's exactly Ms. Sabin's point. She's saying if we accept your argument and take it to its logical conclusion, if someone has a coal-burning furnace in their home, they're technically doing the kinds of things, they're at least loading, may not be bituminous, assume that would be anthracite, well, it doesn't matter. They're at least loading the coal. They're not breaking, crushing it, or sizing it, or cleaning it, or washing it. They're at least loading it. And her argument, if I understand it, is there's got to be some limit. As broad as the mine jurisdiction is, there's got to be some limit to it. And she's relying upon justice. No justice will be to its dissent. And that's certainly true, Your Honor, but that's not this case, because here the commission found that Schmokenfiller sizes, dries, stores, and loads anthracite coal for the purpose of meeting customer specifications or to prepare the coal for a particular use. So we're not talking about a case in which a company is just storing or loading. It's engaged in a broader range of preparation activities than that. Doesn't Misch's jurisdiction seem unlimited? Really? I mean, it seems that they could exercise jurisdiction over any old thing they wanted, as long as it had to do with coal. Well, Congress wrote a very broad definition, and on top of that, it said that doubt should be resolved in favor of coverage. And, you know, one can imagine that Congress was thinking about the safety and health issues that are – If you bag coal, just put it in big bags and load it on a truck and send it somewhere, is that subject you to the Mine Act provisions? So you're saying just storing, bagging, and loading? You have to store it. Yeah, you store it and then you put it in big heavy bags and you load it on a truck and you send it somewhere else? Does that make that transporter or depot operator subject to the Mine Act? I think those are the hardest questions, and the cases have tended to say that if that is at the end of a longer preparation process that preceded it, then those activities are covered, whereas if they're the beginning of consumption, MSHA has been less likely to assert jurisdiction over just the storing and loading. But, again, in this case, we're not dealing with that outer edge of Mine Act jurisdiction. That's not in the statute, right? What you're saying? That's not in the statute. And neither is whether it's raw – whether raw or not raw is the demarcation line. Well, what we do find in the statute, there's really three parts to the definition of the work of preparing the coal. You have the enumerated preparation functions, right? The sizing, drying, storing, loading, crushing, et cetera. And then you have the kinds of coal that are covered, anthracite, bituminous, et cetera. And then you have the catch-all phrase that says, you know, that covers preparation functions that Congress may not have included in that specific list. And when you look at that definition, I mean, there are some clues that lead to this Court's functional test and the Commission's functional test, the idea of work, right, the action being performed, the idea of preparation as a process, right, so a continuum of activities from beginning to end. And so courts have said, this is true. You can't have Mine Act jurisdiction without limit. But it has found the limit by looking first to see what does the company do to the coal. And here, Shemokin is sizing, drying, storing, and loading it, several activities that are covered under the definition of the work of preparing the coal. And then courts ask, why is the company engaged in those functions? Is it for – to prepare the coal for its ultimate use? And that is sort of the limit that courts have drawn. But, again, you know, this case – Isn't that concern magnified by something your adversary points out, and that is their allegation that historically versus currently, there seems to be some inconsistency about what the Secretary is saying about jurisdiction here. Well, I think those concerns are a little exaggerated. I mean, for example, this case, you know, MSHA has had jurisdiction over this facility since 1977, consistent position throughout. And the precise legal question in this case, which is whether Section 802I imposes this raw coal requirement or limitation on the agency, the Secretary has said that that is not the case in the Sixth Circuit, in Kinder Morgan, in the Eighth Circuit and Associated Electric. It's – the consistent position that there is no raw coal requirement in the statute and the distinctions that – the Secretary's position does not reflect that kind of flip-flopping. Is there a definition for a custom coal preparation facility? And that term is used in the statute. And it looks like that's something which is a generic term for certain kinds of operations. Is that definition in the statute in any way, you know, or is that just a term that's there that is not defined? So there's a definition for the work of preparing the coal, but also in the definition of coal or other mine, Congress expressly said that a coal or other mine includes custom coal preparation facilities. Right. And my question is, what is a custom coal preparation facility? Right. So Congress did not separately define that term. The Secretary understands that a custom coal preparation facility has to be engaged in the work of preparing the coal. It's not a separate thing. It does have to be engaged in the work of preparing the coal under Section 802I. But it's perhaps a smaller – Embedded in that answer then, wouldn't it be an assumption what they're doing is working on raw coal? If they're engaged in the work of preparing the coal, why would it apply to someone who is doing something to coal that is other than raw coal? Your Honor, may I finish my answer of your previous question? Well done. So – Very good. No one's ever done that to me before. Well, I think it's – They tell me shut up and listen to my answer. I think it's – Go ahead. I think it's important. So I started to say that Section 802 – I'm asking your permission. No, but answer whatever you want to answer. But she was nice about it. She was really nice about it. That was really well done. My next appellate advocacy class, we're going to cite Sarah L. Johnson. How do you tell a judge to shut up? That was artful. Well done. Well, I mean, so you're asking about the relationship between 802I and then the inclusion of custom coal preparation facilities, which seems to be another creature. And the Secretary understands custom coal preparation facilities to fall within the broader category of worker preparing the coal. But it might be a more specialized kind of facility than all coal preparation plants. So, for example, if you had in the whole universe of coal preparation the kinds of processors that Miss Abrams was describing that are right on the site of extraction that start treating the coal immediately as it comes out of the ground, that might not be a custom coal preparation plant, whereas a plant that has – that is preparing the coal for a very particular use or a more specialized use, a certain kind of customer, that could be sort of a subcategory of the work of preparing the coal. And defining that phrase, preparing the coal, the Act lists about nine or ten different activities that you can look at. How do we analytically look at that to see if a facility is, in fact, doing the work of preparing coal? Do we look at some of those activities, a few? In other words, what if they're just drying and mixing? What if the facility is just doing that or just storing? Is that bringing them within the jurisdiction of the Act? And what percentage? Is it a weighing, balancing, percentages? How do we look at that? I mean, the way this circuit has looked at it in the past is to say, is the company performing any of the activities on that list? If so, which ones? You mean just one, like just sizing? That would bring you within the Act? It could. But then the second part is just to ask whether that activity is, you know, integral to the overall process of preparing. Integral, I guess you said. And that's what this court has said. He interrupted you, too. That's what this court said. But coming back to the example of R&S services, this is a really, to show the phases of coal preparation. So we started with the extractor, right, that pulled the coal out of the ground, processed it, and left it in a refuse pile. R&S picked it up, processed it further, right? And then the Cambria generation thing. Process it further. What did they do to process it? Well, they loaded it. And what this court said in R&S services was that was sufficient to bring it under the jurisdiction of MSHA. And then in air products, the Cambria generation plant, that that plant took the coal that had been processed once on the site, that had been loaded by R&S, and then it further prepared it by sizing it and breaking it and doing several other of the functions. If just loading coal is integral to the preparation of coal or the activity of that facility, that would bring it under the minor. Yes. Just a simple act of loading the coal. Yes. This court's precedent has construed Section 802I very broadly. So would the court like me to address the question of deference and what deference is owed to the Secretary's interpretation? No, we were all, unfortunately, very familiar with Chevron, so I don't think you have to do that. Okay. Well, I would just say, I mean, the Secretary thinks that this can be resolved on the plain language. One interesting point, though. He did it again. He didn't. New Jersey guys, don't shut up New Jersey guys. She's a New Jersey guy. Yeah, she's from Jersey. It's obvious. The reference to the Keystone case seems to be a case somewhat comparable to Shemokin because it did very similar work, yet it was treated differently. And Shemokin tried to bring that up and point out that maybe the Commission's interpretation should not be given as much deference, given that it has somewhat flip-flopped on its view of two similar facilities. Well, I hear two questions in there, so I'll start with the deference owed. It's a good thing you're not asking questions. It's brutal. It definitely is brutal. Yes, you are. She's smiling. She's not. So the deference owed to the Secretary's interpretation under the Mine Act, it really requires a careful analysis because of the Mine Act split enforcement scheme. So under Meade, the Supreme Court has told us that there are only certain kinds of agency pronouncements that get controlling deference, notice and comment rulemaking, final agency adjudications, and then sort of a third category of interpretations reflecting some other comparable indication of comparable congressional intent. And under the Mine Act split enforcement scheme, all of the enforcement and interpretive and policymaking responsibilities are assigned to the Secretary, and adjudication is assigned to the Commission. It's like a court and it has no policymaking role. So even under a Meade analysis, the Secretary's litigation position before the Commission is entitled to controlling deference. And just to hear the Secretary interpreted Section 802I to say that there was no raw coal requirement, and the Commission agreed with that interpretation in an administrative adjudication. So it would be a very anomalous result in this case for the court to say that these two agencies working in concert, both doing their two roles, policymaking and interpretation, and then adjudication can't arrive at an interpretation of the Mine Act that is entitled to controlling deference. And that's what the D.C. Circuit and Eighth Circuit and Fourth Circuit have said. Ms. Avens, would you like to reserve some time? Thank you. Are you going to beat up on us too? No, sir. Okay, you're welcome to. Just to rebut a couple of things here. First of all, on deference, it's our position that your long line of 40 years of cases, all of which are dealing with raw coal when they give jurisdiction to MSHA or they give coverage under the Black Lung Provisions of the Mine Act to workers at mines, those show that the terms are not ambiguous, and therefore no deference analysis is needed. But if there is one needed, just as in the George Harms construction case, skid more deference at most should be accorded. So their position is only entitled to respect to the extent that it is persuasive, and that was the case dealing with the Department of Labor as well. And with regard to deference as well, the exclusion of evidence in this case relieved the Secretary of having to explain the inconsistencies in their position. You're not arguing judicial estoppel, are you? Did I miss that in your brief? You're arguing they've been inconsistent, which usually rises to judicial estoppel, but I don't see judicial estoppel in your brief. Well, in this situation, the Secretary undertook in 2004 a review of these carbon plants, and the two that asked to be released from MSHA jurisdiction, one in 2000, which then triggered the 2004 Kimmel, and then Keystone Filler, all of which do exactly the same things that Shamokin do, they were released from MSHA to OSHA. At the time, Shamokin Filler was owned by other people. When the current owners bought it in 2009 and found out that their direct competitors had all been relieved from MSHA jurisdiction and released to OSHA, they requested that, and when MSHA denied it, this litigation started. That's why we've seen you wrote the letter that that's what led to this. That is what led to this, and there were lots of memos, there was a lot of deposition testimony from the inspectors and the investigators involved with that review of carbon plants, all of which was excluded by Judge Lewis. It wasn't redundant testimony. He kept all of it out, including a legal memo that they produced to us through a FOIA after trial, although the FOIA was filed before trial. Those were memos prepared by staff, individuals. I mean, they weren't necessarily reports or memos of the secretary. But it showed that the secretary, at least in 2004, had the exact same reasoning that we've been articulating here and determined that jurisdiction over the carbon plants lay with OSHA. And what's our standard of review for the secretary's withholding of that information or excluding it? Right. But then they released it through a FOIA after the decision came out. Chief Judge McKee asked what's the standard of review. Oh, the standard of review for statutory interpretation and legal issues is de novo for factual findings and substantial evidence, and in fact, the secretary mischaracterized the commission's finding about But exclusion of the evidence. Isn't the standard review abuse of discretion? That would be abuse of discretion, yes. I was getting to that. Okay. Sorry, I thought you asked for all the standards of review. With respect to the legislative history. Well, we've gotten into that. We understand that you're briefing, your red light is on. So why don't we take that. You presented that very thoroughly, I think, in your brief. I thank you very much, Ms. Jacobs. Thank you. Ms. Johnson, thank you very much. Are you from Jersey, by the way? No. Okay. You should be. You should be. Yeah. Too bad. Yeah. Okay.